LLOYD A. FRY ROOFING CO. *v.* WOOD ET AL.,
MEMBERS OF THE ARKANSAS PUBLIC
SERVICE COMMISSION.

No. 37.   Argued November 10, 1952.—Decided December 8, 1952.

*Glenn M. Elliott* argued the cause for petitioner. With him on the brief was *James W. Wrape.*

*John R. Thompson* and *Eugene R. Warren* submitted on brief for respondents.

MR. JUSTICE BLACK delivered the opinion of the Court.

The petitioner, Lloyd A. Fry Roofing Company, manufactures asphalt roofing products in Memphis, Tennessee, and sends them in trucks to customers in nearby states. Some of these trucks are driven by their owners who have allegedly leased them to the petitioner. Five of these driver-owners while carrying Fry's interstate shipments on Arkansas highways were arrested for having failed to obtain a permit as required of all contract carriers by § 11 of the Arkansas Motor Act.[1] Petitioner brought this action in an Arkansas state court to enjoin the state's Public Service Commission from further molestation or prosecution of the drivers. The bill asserted both state and federal grounds for denying that the state law could be applied to require a permit. The state grounds alleged were: Neither petitioner Fry Roofing Company nor the truck drivers could be required to get a state permit, because the state law exempted "private" carriers from that duty, and petitioner was such a "private carrier"—that is, a commercial enterprise, carrying its own products exclusively in its own leased trucks operated by its own bona fide driver-employees. Since, petitioner claimed, the drivers were its bona fide employees, it necessarily followed that they need not get

---

[1] "No person shall engage in the business of a contract carrier by motor vehicle over any public highway in this State unless there is in force with respect to such carrier a permit issued by the Commission, authorizing such persons to engage in such business. . . ." Ark. Acts 1941, No. 367, at 937, 947–948.

state permits as "contract carriers" because they were not in the business of transporting goods for hire.[2]   The federal ground asserted by petitioner to prevent application of the state statute was that requiring either Fry or the drivers to get state permits would unduly burden interstate commerce in violation of the United States Constitution and would invade a field of regulation pre-empted by the Federal Motor Carrier Act.[3]

Answering the bill, the State Commission asked the court to dismiss it, strongly urging that petitioner's alleged lease of trucks and operation of them by its own employees were mere pretenses, a subterfuge to enable petitioner and others to evade and escape the regulatory provisions of the Arkansas Motor Act.   After lengthy hearings the trial court found that the arrested drivers were in fact bona fide employees of petitioner, that the truck leases were also bona fide, and that petitioner was therefore transporting its own goods as a private carrier exempt from the state Act.   For this reason the court held that the Act did not require either petitioner or its drivers to get a permit.   Accordingly the Commission was enjoined as prayed.   Reviewing the facts for itself the State Supreme Court found that the arrested truck

---

[2] The State Act's definition of a contract carrier is:

"The term 'contract carrier by motor vehicle' means any person, not a common carrier included under Paragraph 7, Section 5 (a) of this Act, who or which, under individual contracts or agreements, and whether directly or indirectly or by a lease of equipment or franchise rights, or any other arrangement, transports passengers or property by motor vehicle for compensation."   Ark. Acts 1941, No. 367, § 5 (a) (8).   Compare definition in the United States Motor Carrier Act, Part II of the Interstate Commerce Act, 49 U. S. C. § 303 (15).

[3] 49 Stat. 543, as amended, 54 Stat. 919, 49 U. S. C. §§ 301 et seq. The Federal Act contention was not specifically referred to in the original bill, but was urged in, considered and rejected by the State Supreme Court.

drivers were not petitioner's employees, that the truck lease arrangements were shams, and that petitioner was therefore a shipper—not a carrier of any kind. In this situation the court found that the driver-owners were in reality transporting petitioner's goods as "contract carriers" for hire, engaged in the very kind of business for which § 11 of the state Act required a permit. The court then dismissed the bill and denied a rehearing, thereby rejecting the federal questions raised. 219 Ark. 553, 244 S. W. 2d 147. Certiorari was granted because of the Commerce Clause and Federal Motor Carrier Act questions. 343 U. S. 962.

We are urged to set aside the findings of the State Supreme Court before passing upon the constitutional questions presented. Petitioner contends that these findings are without evidential support and that the subsidiary findings do not support the ultimate conclusion that the leases were shams. Whether rejection of these findings would place petitioner's Commerce Clause contentions in a more favorable position, we need not consider. For there is much record evidence, both oral and written, some of which tends to support petitioner's contention of good-faith arrangements and some the contrary. Some details of petitioner's conduct resemble and some details differ from patterns of conduct found by courts in other cases to have been contrived to avoid legal regulation. See, e. g., *United States* v. *La Tuff Transfer Service,* 95 F. Supp. 375, and cases there cited. There are no exceptional circumstances of any kind that would justify us in rejecting the Supreme Court's findings; they are not without factual foundation, and we accept them.

The finding that the arrested drivers own and operate the trucks for hire makes them contract carriers as defined in the State Act. Section 11 of that Act requires contract carriers to get a permit and outlines certain considerations

the State Commission may weigh in granting or refusing the permit. Among these matters is the adequacy of transportation services already being performed by "any railroad, street railway or motor carrier." Refusal of a state certificate based on such grounds was held to be an unconstitutional obstruction of interstate commerce in *Buck* v. *Kuykendall*, 267 U. S. 307. To deny these interstate carriers an Arkansas permit for such reasons would conflict with the *Buck* holding.

Unlike the situation in the *Buck* case, Arkansas has not refused to grant a permit for interstate carriage of goods on state highways. It has asked these driver-owners to do nothing except apply for a permit as contract carriers are required to do by the State Act. And the State Commission here expressly disclaims any "discretionary right to refuse to grant a permit for contract carriage where that carriage is in interstate commerce." The state asserts no power or purpose to require the drivers to do more than register with the appropriate agency.[4] Such an identification is necessary, the Commission urges, in order that it may properly apply the state's valid police, welfare, and safety regulations to motor carriers using its highways. Nor is there any showing whatever that the Commission has attempted or will attempt to attach any burdensome conditions to the grant of a permit, or conditions that would in any manner

---

[4] "It appeared that while the Act calls the certificate one of 'public convenience and necessity,' the Commission had recognized, before this suit was begun, that, . . . it had no discretion where the carrier was engaged exclusively in interstate commerce, and was willing to grant to plaintiffs a certificate upon application and compliance with other provisions of the law." *Clark* v. *Poor*, 274 U. S. 554, 556. In the *Clark* case this Court affirmed an order dismissing the bill. See *Columbia Terminals Co.* v. *Lambert*, 30 F. Supp. 28, 32, and 309 U. S. 620.

conflict with the National Motor Carrier Act or any Interstate Commerce Commission regulations issued thereunder. Moreover, the Arkansas Act imposes upon its Commission the duty of reconciling state regulation with that of the Interstate Commerce Commission, just as the Interstate Commerce Act requires federal officials to cooperate with the states and their duly authorized state officials. Here neither petitioner nor the drivers have obtained any kind of authority from the Interstate Commerce Commission. Indeed, petitioner's whole case has been built on the premise that neither it nor the drivers must get a permit from the state or the national regulatory agency. In this situation our prior cases make clear that a state can regulate so long as no undue burden is imposed on interstate commerce, and that a mere requirement for a permit is not such a burden.[5] It will be time enough to consider apprehended burdensome conditions when and if the state attempts to impose and

[5] In *Columbia Terminals Co.* v. *Lambert,* 30 F. Supp. 28, the District Court upheld a Missouri statute reading: "It is hereby declared unlawful for any motor carrier . . . to use any of the public highways of this state for the transportation of persons or property, or both, in interstate commerce without first having obtained from the commission a permit so to do. . . ." *Buck* v. *Kuykendall,* 267 U. S. 307, was held not to require the statute's invalidation, since Missouri had not refused to grant a permit on the ground that the state had power to say what interstate commerce would benefit the state and what would not. Agreeing with this constitutional holding, we ordered the complaint dismissed. 309 U. S. 620. See also *Eichholz* v. *Public Service Comm'n,* 306 U. S. 268, 273–274; *H. P. Welch Co.* v. *New Hampshire,* 306 U. S. 79, 84, 85; *Maurer* v. *Hamilton,* 309 U. S. 598, affirming 336 Pa. 17, 7 A. 2d 466; *McDonald* v. *Thompson,* 305 U. S. 263, affirming 95 F. 2d 937; *South Carolina State Highway Dept.* v. *Barnwell Bros., Inc.,* 303 U. S. 177. Cf. *Buck* v. *Kuykendall,* 267 U. S. 307, and *Hood & Sons, Inc.* v. *Du Mond,* 336 U. S. 525, 538.

enforce them. At present we hold only that Arkansas is not powerless to require interstate motor carriers to identify themselves as users of that state's highways.

*Affirmed.*

Mr. Justice Douglas, with whom The Chief Justice, Mr. Justice Burton and Mr. Justice Minton join, dissenting.

Whether the driver-owners involved here are contract or private carriers is immaterial to the determination of the federal question presented. That question is whether Arkansas can require a person engaged exclusively in the interstate transportation of goods by motor carrier to obtain a certificate of necessity and convenience from Arkansas. That is precisely what Arkansas has required, as made clear by the opinion of the State Supreme Court in the instant case. The Court said,

"We are of the opinion that the driver-owners involved in this litigation were *contract carriers*" (as defined in the Arkansas statute) and ". . . and that they were therefore required to have a Certificate of Necessity and Convenience from the Arkansas Public Service Commission." 219 Ark. 553, 557, 244 S. W. 2d 147, 149.

The label "Certificate of Necessity and Convenience" is more accurate than the word "permit," for the Arkansas law makes the grant of permission dependent upon a consideration of the following factors:[1] "the reliability and financial condition of the applicant"—his "sense of responsibility toward the public"—"the transportation service being maintained by any railroad, street railway

---

[1] The relevant parts of § 11 of Act No. 367, Ark. Acts 1941, pp. 947–949, are as follows:

"(a) No person shall engage in the business of a contract carrier by motor vehicle over any public highway in this State unless there

or motor carrier"—"the likelihood of the proposed service being permanent and continuous throughout twelve months of the year"—"the effect which such proposed transportation service may have upon existing transpor-

---

is in force with respect to such carrier a permit issued by the Commission, authorizing such persons to engage in such business. . . .

.     .     .     .     .

"(c) Subject to this Act a permit shall be issued to any qualified applicant therefor authorizing in whole or in part the operations covered by the application, if it appears from the application or from any hearing held thereon, that the applicant is fit, willing, and able to properly perform the service of a contract carrier by motor vehicle and to conform to the provisions of this Act and the lawful requirements, rules and regulations of the Commission, and the proposed operation, to the extent authorized by the permit, will promote the public interest and the policy declared in Section Two (2) of this Act; otherwise such application shall be denied. . . .

.     .     .     .     .

"(e) In granting applications for permits, the Commission shall take into consideration the reliability and financial condition of the applicant and his sense of responsibility toward the public; the transportation service being maintained by any railroad, street railway or motor carrier; the likelihood of the proposed service being permanent and continuous throughout twelve months of the year, and the effect which such proposed transportation service may have upon existing transportation service; and any other matters tending to show the necessity or want of necessity for granting said application.

"(f) The Commission shall specify in the permit the business of the contract carrier covered thereby and the scope thereof and shall attach to it, at the time of issuance, and from time to time thereafter, such reasonable terms, conditions, and limitations consistent with the character of the holder as a contract carrier as are necessary to carry out, with respect to the operations of such carrier, the requirements established by the Commission under this Act; provided, however, that no terms, conditions, or limitations shall restrict the right of the carrier to substitute or add contracts within the scope of the permit, or to add to his or its equipment facilities, within the scope of the permit, as the development of the business and the demands of the public may require."

tation service"—"any other matters tending to show the necessity or want of necessity for granting said application." The permit will issue if it appears that "the applicant is fit, willing, and able" properly to perform the service and if the proposed operation "will promote the public interest" and the policy of the Act.[2]

This statute is a regulation of interstate commerce, not a regulation of the use of Arkansas' highways. It is precisely the kind of control which the State of Washington tried to exercise over motor carriers and which was denied her by *Buck* v. *Kuykendall,* 267 U. S. 307. As Mr. Justice Brandeis, speaking for the Court in that case, said, the effect of this kind of state regulation is "not merely to burden but to obstruct" interstate commerce. *Id.,* at 316.

State regulations in the interest of safety, the exaction of a fee for highway maintenance, and the like are of a different character. See *Highway Dept.* v. *Barnwell Bros.,* 303 U. S. 177, 189, and cases cited. So is a requirement that an interstate carrier get a permit to do intrastate business. See *Eichholz* v. *Commission,* 306 U. S. 268.

The certificate or permit exacted here is one authorizing an interstate contract carrier "to engage in such business." Until today no state could impose any such condition on one engaged exclusively in interstate commerce. Until today such a certificate was the concern solely of the Interstate Commerce Commission. Congress gave the Commission authority to regulate interstate contract carriers (49 U. S. C. § 304 (a)(2)). Congress made it mandatory for them to obtain a permit to do business (*id.,* § 309). It gave the Commission broad powers of investigation over these carriers (*id.,* § 304 (c)), provided for injunctions against violations (*id.,* § 322 (b)), and imposed

---

[2] § 11, note 1, *supra.*

criminal sanctions (*id.*, § 322 (a)). There is no phase of the operation, which Arkansas in this action seeks to regulate, that Congress has left untouched. It is the Interstate Commerce Commission that must determine whether this leasing operation is bona fide or a sham, whether the carriers are private interstate carriers requiring no permit or interstate contract carriers requiring one. Congress in other words has pre-empted the field, precluding both inconsistent and overlapping state regulations.[3] See *Hines* v. *Davidowitz,* 312 U. S. 52; *Hill* v. *Florida,* 325 U. S. 538; *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218; *Bethlehem Steel Co.* v. *State Board,* 330 U. S. 767; *La Crosse Tel. Corp.* v. *Wisconsin Board,* 336 U. S. 18; *Plankinton Packing Co.* v. *Wisconsin Board,* 338 U. S. 953; *Automobile Workers* v. *O'Brien,* 339 U. S. 454.

---

[3] *Columbia Terminals Co.* v. *Lambert,* 30 F. Supp. 28, whose ruling we sustained, 309 U. S. 620, is not in point. The Interstate Commerce Commission had ruled in that case that the particular operations there involved were not covered by the Federal Act. See 30 F. Supp., at 30.